UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILL MCLEMORE; MCLEMORE AUCTION COMPANY, LLC; RON BRAJKOVICH; JUSTIN SMITH; and BLAKE KIMBALL, <br><br> Plaintiffs, <br><br> v. <br><br> ROXANA GUMUCIO, in her official capacity as Executive Director of the Tennessee Auctioneer Commission; THE ASSISTANT DIRECTOR OF THE TENNESSEE AUCTIONEER COMMISSION, in his official capacity; and KIMBALL STERLING, JEFF MORRIS, LARRY SIMS, ED KNIGHT, and DWAYNE ROGERS, in their official Capacities as members of the Tennessee Auctioneer Commission, <br><br> Defendants. | Case No. 3:23-cv-01014 <br> Judge Aleta A. Trauger |

## MEMORANDUM

The plaintiffs have filed a Motion for Preliminary Injunction (Doc. No. 8), to which the defendants (collectively, the "Commissioner") have filed a Response (Doc. No. 12), and the plaintiffs have filed a Reply (Doc. No. 14). The Commissioner has filed a Motion to Dismiss (Doc. No. 18), to which the plaintiffs have filed a Response (Doc. No. 22), and the Commissioner has filed a Reply (Doc. No. 23). For the reasons set out herein, the plaintiffs' motion will be denied, and the Commissioner's motion will be granted.

## I. BACKGROUND

Since 1967, Tennessee has regulated auctions and auctioneers within its borders. *See* 1967 Tenn. Pub.Acts, ch. 335. That statutory scheme, in its current form, makes it unlawful to

"[a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by" the Tennessee Auctioneer Commission. Tenn. Code Ann. § 62-19-102(a)(1). An aspiring auctioneer can receive a license by completing a sufficient course of instruction and passing the Commission's licensure exam. *See* Tenn. Code Ann. § 62-19-111. If an individual wishes to be a "principal auctioneer"—that is, an auctioneer who does not work for another auctioneer—he also must have a high school diploma and serve for six months as an "affiliate auctioneer" under a principal auctioneer's supervision. Tenn. Code Ann. § 62-19-111(c). No license is required if an individual "generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions." Tenn. Code Ann. § 62-19-103(12). The Tennessee statutes, in their current form, apply only to individual auctioneers; they do not require a business entity that employs or works with those auctioneers to obtain separate licensure. See Tenn. Code Ann. §§ 62-19-101(1), (3), (4), (9).

An auctioneer license grants the holder the right to "conduct auctions at any time or place in" Tennessee. Tenn. Code Ann. § 62-19-115(a). The license scheme, however, serves another purpose, aside from simply dictating who is permitted to run an auction. The fees associated with obtaining or renewing a license include a required payment into the state's "auctioneer education and recovery account," and that account is available, by court order, to provide compensatory damages to individuals injured by a licensee's violation of the state's rules. Tenn. Code Ann. § 62-19-116(a)–(d). A licensee "must obtain six (6) hours of continuing education per renewal cycle in order to renew a license." Tenn. Comp. R. & Regs. 0160-03-.03(1).

Auctioneering—like many areas of commerce—has seen the rise of new methods and practices intended to take advantage of advances in computing and information technology. Those changes have, in turn, given rise to questions regarding what qualifies as an auction for

licensure purposes. Broadly speaking, Tennessee's licensure statutes define "auction" to mean "a sales transaction conducted by oral, written, or electronic exchange between an auctioneer and members of the audience, consisting of a series of invitations by the auctioneer for offers to members of the audience to purchase goods or real estate, culminating in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience." Tenn. Code Ann. § 62-19-101(2). There are, however, a number of exemptions to that definition, including an exemption for "[a]ny fixed price or timed listings that allow bidding on an internet website, but do not constitute a simulcast of a live auction." Tenn. Code Ann. § 62-19-103(9).

There is no such exception for online listings for sale that are neither "fixed price" nor "timed." The "fixed price" distinction is self-explanatory: a sale with a fixed price is not an auction, as conventionally understood, and need not be regulated as such. The exemption of "timed" auctions, however, reflects a different set of concerns. A "timed listing" is a listing "offering goods for sale with a fixed ending time and date that does not extend based on bidding activity." Tenn. Code Ann. § 62-19-101(12). In contrast, an "extended-time" auction may begin with a minimum time period, but that period is extended as long as bidders keep bidding—much like an ordinary, in-person auction. While either type of auction can result in an escalatory bidding war, that risk is inherently more pronounced in an extended-time auction, due to the lack of a fixed cutoff time for bids.

The individual plaintiffs conduct online extended-time auctions through the business entity plaintiff, McLemore Auction Company, LLC. (Doc. No. 1 ¶¶ 2, 7–11.) Plaintiff Will McLemore is a licensed auctioneer and that company's founder. (*Id.* ¶ 7.) The other individual plaintiffs—Ron Brajkovich, Justin Smith, and Blake Kimball—are McLemore Auction

3

Company employees who, unlike McLemore, are not licensed auctioneers. (*Id.* ¶¶ 9–12.) According to the plaintiffs, Brajkovich, Smith, and Kimball each "conducts [extended-time] online auctions" without an auctioneer license. (*Id.* ¶¶ 44–47.)

In 2019, McLemore and a Kansas-based auctioneer, along with their companies, filed suit in this court alleging that Tennessee's licensure requirement is unconstitutional under either the First Amendment or the dormant Commerce Clause doctrine. (*See* Case No. 3:19-cv-530, Doc. No. 1.) That litigation was assigned to another judge, who granted the plaintiffs summary judgment based on the Commerce Clause issue and elected not to resolve the First Amendment claim, which the court found to be functionally redundant. *See McLemore v. Gumucio*, 593 F. Supp. 3d 764, 783 (M.D. Tenn. 2022). The Commissioner appealed, however, and the Sixth Circuit held that no plaintiff had standing to bring the dormant Commerce Clause challenge. The court, accordingly, vacated the district court's decision and remanded with instructions to dismiss for lack of jurisdiction. *See McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *3 (6th Cir. June 20, 2023). Based on that instruction, the district court dismissed the case without reopening the question of whether Tennessee's statutes comport with the First Amendment. (*See* Case No. 3:19-cv-530, Doc. No. 134.) The parties agree that, although the district court did perform some preliminary analysis related to the First Amendment in that case, neither the district court nor the Sixth Circuit ultimately resolved the First Amendment-based claim on the merits. (*See* Doc. No. 8-1 at 7.)

On September 25, 2023, these plaintiffs—three of whom were not part of the earlier litigation—filed their Verified Complaint in this case. (Doc. No. 1.) The Complaint asserts one claim, under 42 U.S.C. § 1983, alleging that Tennessee's licensure scheme violates the First Amendment. (*Id.* ¶¶ 50–65.) On October 3, 2023, the plaintiffs filed a Motion for Preliminary

4

Injunction asking the court to enjoin the Commissioner from "applying Tennessee's auctioneering laws, licenses, and regulations to 'sales transaction[s] conducted by . . . electronic exchange between an auctioneer and members of the audience, consisting of a series of invitations by the auctioneer for offers to members of the audience to purchase goods or real estate, culminating in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience.'" (Doc. No. 8 at 1 (quoting Tenn. Code Ann. § 62-19-101(2)).) On November 22, 2023, the defendants filed a Motion to Dismiss in which they argue that (1) the plaintiffs lack standing and, in the alternative, (2) their claims fail on the merits. (Doc. No. 18.)

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of*

5

*Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

**B. Rule 12(b)(1)**

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is significantly less demanding. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating a facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Genetek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

**C. Rule 12(b)(6)**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must

6

Case 3:23-cv-01014   Document 30   Filed 08/19/24   Page 6 of 18 PageID #: 250

determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. ANALYSIS

#### A. Standing

A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue, before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

180–81 (2000). These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

The Commissioner's argument that the plaintiffs lack standing has two primary parts, each of which bears on the question of injury-in-fact. First, the Commissioner argues that McLemore lacks standing because he is already licensed and faces no ongoing or imminent future burden under the challenged laws. Second, the Commissioner argues that, while an unlicensed auctioneer who actually intended to violate the licensing scheme might have standing, the Complaint's allegations regarding Brajkovich, Smith, and Kimball are too conclusory to support such a holding. Regarding the other plaintiff, McLemore Auction Company, LLC, the Commissioner admits that, if the employee plaintiffs can establish standing based on their own injuries, the resultant economic costs to the company "might be cognizable injuries for standing purposes" under Article III. (Doc. No. 19 at 8.) The Commissioner disputes, however, whether the company would have a claim under § 1983—a distinct question from constitutional standing. *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388 n.9 (2d Cir. 2015) (collecting cases)

The unlicensed employees' standing presents the most straightforward question. While the Commissioner is correct that the Complaint is relatively short on details regarding those plaintiffs' actions, the court does not ultimately find that pleading to be impermissibly conclusory. The Verified Complaint clearly states that each employee "conducts online auctions in Tennessee." (Doc. No. 1 ¶¶ 9–11.) That formulation may not include much detail, but the statute at issue does not require it. The Tennessee licensure statute does not adopt any complex or exacting definition of when it applies; it simply requires a license any time a person "[a]ct[s] as, advertise[s] as, or represent[s himself] to be an auctioneer," unless an exemption applies

Tenn. Code Ann. § 62-19-102(a). Brajkovich, Smith, and Kimball have explicitly asserted that they act as auctioneers, in direct violation of that provision.

Admittedly, the Complaint itself does not expressly establish whether or not Brajkovich, Smith, or Kimball might qualify for an exemption to licensure. Those three plaintiffs, however, have filed Declarations specifically addressing that issue, including by asserting that their auctions generate sufficient revenue to put them beyond the exemption for auctioneers generating under $25,000 per year. (See Doc. No. 14-1 ¶¶ 4–5; Doc. No. 14-2 ¶¶ 5–6; Doc. No. 14-3 ¶¶ 6–7.) If this case were to continue, it might be wise for the plaintiffs to amend their complaint in order to include those allegations in the pleading itself. The court, however, will not dismiss the plaintiffs' claims simply because no such amendment has yet been made.

It is, moreover, not fatal to the unlicensed plaintiffs' claims that no enforcement action has yet been initiated against them. "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" the constitutionality of a law regulating an individual's ongoing or expected future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). It is sufficient to establish a "substantial probability" or "credible threat" of enforcement. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). Brajkovich, Smith, and Kimball have alleged that they are in active, ongoing violation of a binding state licensure requirement. The Commissioner is aware of that assertion, and there is nothing in the record to suggest that the Commissioner would not enforce the licensure requirement against Brajkovich, Smith, or Kimball if they continue to violate it. Therefore, the employee plaintiffs have pleaded an actual

or imminent injury-in-fact attributable to the defendants' conduct and potentially remediable in this litigation.

The court is similarly unpersuaded that McLemore's current license deprives him of standing. Although the Sixth Circuit held that McLemore lacked standing in the earlier litigation, that holding was based on the Sixth Circuit's understanding that McLemore was, at that point, alleging only a dormant Commerce Clause doctrine claim based on the potential extraterritorial application of the licensure scheme. In light of that conception of the case's scope, the Sixth Circuit found no standing because "McLemore is an in-state auctioneer and thus concededly must obtain a Tennessee license in any event." *McLemore*, 2023 WL 4080102, at *2. No such issue is present here.

The bare fact that McLemore is currently in compliance with the licensure scheme does not mean that he is unharmed by it. "All licenses issued by the commission expire two (2) years from the original date the license was issued." Tenn. Code Ann. § 62-19-111(i). McLemore will, therefore, face a need to obtain renewed licensure in the foreseeable future, and, if he does not do so, his predicament will be indistinguishable from that of the other individual plaintiffs. The licensure statutes, moreover, impose some affirmative obligations on McLemore as a licensee, including—if he wants to renew his license when that expiration date arrives—a continuing education requirement. *See* Tenn. Comp. R. & Regs. 0160-03-.03(1). The presence of those ongoing obligations further support a finding of standing.

In any event, McLemore's employees have sufficiently pleaded standing, and the Sixth Circuit has suggested that, "[w]hen one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir. 2016). The Commissioner disputes that proposition, but the

10

issue is, at most, academic. Dismissing McLemore from the case would not meaningfully change the litigation's scope or the ultimate substantive question of whether the licensure scheme comports with the First Amendment. The court, accordingly, sees no reason to depart from the rule recognized by the Sixth Circuit and will permit all of the functionally identical claims to proceed.

### B. Merits of First Amendment Challenge

If the Commissioner is correct that the plaintiffs have failed to state a claim on which relief can be granted, then the plaintiffs are, by definition, not entitled to a preliminary injunction. The court, accordingly, will first consider the merits of the plaintiffs' claims and will proceed to the remaining preliminary injunction factors only if necessary.

The Commissioner argues that the constitutionality of the Tennessee auctioneer licensure statute is wholly resolved by the Sixth Circuit's decision upholding Ohio's precious metals dealer licensure statute in *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 693 (6th Cir. 2014). That statute, like this one, regulated commercial communication, in that its applicability depended on whether one was "holding oneself out" as a precious metals dealer. *Id.* at 692. Nevertheless, the Sixth Circuit recognized that the licensure scheme was, for the purposes of the First Amendment, simply an ordinary business regulation, such that the government "need[ed] only demonstrate that the statute's classification and the licensing requirement [were] rationally related to a legitimate government interest." *Id.* at 693. That approach is consistent with the principle—essential to the government's well-established power to regulate economic activity— that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

11

The plaintiffs suggest that the Sixth Circuit's approach in *Liberty Coins* cannot be squared with the Supreme Court's later decision in *National Institute of Family and Life Advocates ("NIFLA") v. Becerra*, 585 U.S. 755 (2018), in which the Court addressed the constitutionality of a particular disclosure requirement imposed on licensed clinics that provided family planning or pregnancy-related services. The Supreme Court, however, did not treat that law as an ordinary business regulation, because, among other things, the law required specific disclosures that "in no way relate[d] to the services that licensed clinics provide[d]." *NIFLA*, 585 U.S. at 769. This case poses no such problem. The plaintiffs do not challenge any particular notice they must provide or step they must take in connection with running an auction or holding a license. Rather, they simply do not want to have to obtain a license to engage in this profession at all. *NIFLA* raises issues about what the government can require *as part of* its licensure authority, but nothing about it brings that licensure authority itself into doubt. The court, accordingly, finds no basis in *NIFLA* for treating *Liberty Coins* as overruled.

The plaintiffs next argue that this case is distinguishable from *Liberty Coins* because auctioneering is, in their view, a more speech-centered profession than dealing in metals, and Tennessee's auctioneer licensure statute is more directly targeted at speech than Ohio's corresponding statute governing precious metals dealers. The judge who considered McLemore's earlier challenge found a version of this argument potentially persuasive. *See McLemore*, 2020 WL 7129023, at *19. The issue was not, however, ever resolved definitively in connection with a dispositive motion in that case, and the plaintiffs have identified no reason why the earlier court's preliminary openness to this argument would bind this court's consideration of the issue in this case.

12

Case 3:23-cv-01014 Document 30 Filed 08/19/24 Page 12 of 18 PageID #: 256

Based on this court's review of the Ohio statute at issue in *Liberty Coins* and the Tennessee auctioneering statute at issue here, the court cannot conclude that Tennessee's statute regulates speech any more than Ohio's does. Auctioneers do "speak" for a living, in a colloquial sense—but so do metals dealers. Every salesperson does. Auctioneering may involve more dramatic forms of communication than some other sales jobs do—in that there is an element of competition involved—but, ultimately, every person who works in sales or in the facilitation of sales is a professional communicator. A salesperson communicates that an item is for sale. He, often, communicates details about the item and reasons why one might want to purchase it. He communicates the price. If there are negotiations, he communicates another price. And, finally, he communicates his assent to the terms of sale. All of those steps involve communication, whether the underlying transaction is an auction or not. The government, however, routinely regulates transactional activity, based on the foundational rule that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006)). All commerce involves communication, but the courts have never suggested that that fact turns all commercial regulation into a First Amendment issue.

Tennessee's licensure scheme, moreover, is drafted with the recognition that its purpose is to regulate transactions, not speech. A license is not required to work as a copywriter or a graphic designer for an auction company. A license is not required to run advertisements for some else's auctions in one's publication. A license is only required to conduct an auction or to hold oneself out as a person who does so—and an auction, under the express definition of

13

Tennessee's statutes, is a type of "sales transaction." Tenn. Code Ann. § 62-19-101(2). The plaintiffs act as if it is constitutionally suspect that, to be an auction, the transaction must, among other things, be "conducted by oral, written, or electronic exchange between an auctioneer and members of the audience," *id.*, but that describes nearly every transaction that occurs in the American economy. An auctioneer's speech is no less transactional, and no more protected, than a cashier's or a pharmaceutical wholesaler's.

The plaintiffs also echo the argument, raised in the earlier litigation, that the Tennessee licensure scheme is different from the Ohio licensure scheme because the Ohio statute applies "'regardless of whether [the seller] advertise[s] or post[s] signage' (i.e., engage[s] in speech)." *McLemore*, 2020 WL 7129023, at *19 (quoting *Liberty Coins*, 748 F.3d at 697). The specific terms of the Ohio statute, however, weigh against that reading. The Sixth Circuit did note that the Ohio statute applied to dealers even if they did not advertise or post signage, but that does not mean that the Ohio statute had no communicative component. In fact, the opposite is true: if anything, the scope of the Ohio statute is more dependent on communication than Tennessee's, not less. By the plain text of the Ohio statute, it applies only to "a person who is engaged in the business of purchasing articles made of or containing gold, silver, platinum, or other precious metals or jewels of any description *if, in any manner, including any form of advertisement or solicitation of customers, the person holds himself, herself, or itself out to the public as willing to purchase such articles*." Ohio Rev. Code Ann. § 4728.01(A) (emphasis added). The Tennessee statute, in contrast, makes it unlawful to "*[a]ct as*, advertise as, *or* represent to be an auctioneer without holding a valid license." Tenn. Code Ann. § 62-19-102(a)(1) (emphasis added). It is, therefore, Tennessee's statute, not Ohio's, that can apply based solely on the character of the transaction at issue, without any additional requirement focused on speech or communication.

14

The Tennessee statute, as applied to these plaintiffs,[1] is simply a straightforward licensing scheme for performing a specific type of commercial transaction—even more so than the statute challenged in *Liberty Coins*, which applied only if one made one's availability for that type of transaction publicly known. The plaintiffs, moreover, have not identified any way in which the Tennessee licensure scheme burdens them any more significantly than Ohio's scheme burdened precious metals dealers. The plaintiffs' argument for distinguishing *Liberty Coins* is, at most, an argument for overruling *Liberty Coins* as wrongly decided—which this court has no power to do. The precedents of this circuit, therefore, require dismissal.

It bears noting, however, that, even if one were to disregard both *Liberty Coins* and its rationale in favor of treating Tennessee's licensure scheme as subject to an elevated level of scrutiny under the First Amendment, there would be substantial grounds for doubting the viability of the plaintiffs' claims. The plaintiffs make much of the fact that the Supreme Court, in *NIFLA*, expressed skepticism of the idea, espoused by some courts, that laws governing "professional speech" are subject to a distinct, relatively forgiving First Amendment framework. *NIFLA*, 585 U.S. at 766–67. Even if one treats all of the lower courts' "professional speech" precedents as overruled, however, it would not necessarily mean much in terms of the constitutionality of licensing of auctioneers in particular. Doctrines about professional speech largely focus on the government's power to regulate advisory professions—like law, counseling, or medicine—in which a licensed individual gives a client or patient advice "based on '[his] expert knowledge and judgment.'" *Id.* at 767 (quoting *King v. Governor of the State of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014)). Auctioneering, however, is a transaction-focused profession, not an advisory one. While auctioneers undoubtedly do provide advice sometimes,

---

[1] While there may be distinct constitutional questions related to the Tennessee statute's application to individuals who merely advertise themselves as auctioneers but do not actually "act as" such, any such questions are not at issue in this case.

their core function is to facilitate sales of products. Because transactions are involved, another line of First Amendment caselaw is relevant: that involving regulation of *commercial* speech.

The Supreme Court has long held that so-called "commercial speech . . . is entitled to reduced protections under the First Amendment." *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003 (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)). While it is "not always clear" what qualifies as "commercial speech," *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017), one of the key considerations is "the commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Cent. Hudson*, 447 U.S. at 562 (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–456 (1978); citing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 381 (1977); Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va. L. Rev. 1, 38–39 (1979)). From that perspective, an auction is as clear an example of commercial speech as one is likely to find. An auction consists of parties proposing a series of alternative transactions to each other before settling on one that actually goes into effect; it is little more than a competition between commercial utterances. Holding oneself out as an auctioneer simply involves adding another layer of commercial speech to that process—a solicitation to assist others in their own solicitations. All of the speech at issue is paradigmatically commercial.

Content-neutral commercial speech regulations[2] are typically subject only to intermediate scrutiny, *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 703 (6th Cir. 2020), which

---

[2] A higher level of constitutional protection—strict scrutiny—applies to some commercial speech regulations on the ground that those regulations are not "content neutral." *See International Outdoor*, 974 F.3d at 706. The concept of "content neutrality" relevant to this context, however, can be challenging to nail down. Every restriction on commercial speech is, in a sense, a content-based regulation, because the commercial character of speech is, by necessity, a feature of the speech's content—speech cannot be commercial without being *about commerce*, which is a content-based distinction. Strict scrutiny only

requires a law to "be 'narrowly tailored to serve a significant government interest[] and leave open ample alternative channels of communication.'" *Ramsek v. Beshear*, 989 F.3d 494, 498 (6th Cir. 2021) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). The State of Tennessee's significant interest in overseeing the practice of auctioneering has been established and acted upon for over fifty years and reflects the inherent vulnerability of auctions to fraud—for example, through the use of fake or covertly subsidized bids to drive up a price. The licensure requirement is, moreover, a relatively undemanding tool for addressing that genuine problem. It is, therefore, questionable whether the plaintiffs could prevail under intermediate scrutiny.

This court, however, need not answer that question, because *Liberty Coins* governs this case in its entirety. Under the law of the Sixth Circuit, Tennessee's auctioneer licensing system is an economic regulation that burdens speech only insofar as that speech is made in facilitation of the economic transactions that Tennessee has, within its ordinary authority, chosen to regulate. The law is therefore subject to rational basis review and must be treated as consistent with the Constitution as long as it is rationally related to a legitimate government purpose. The plaintiffs identify no reason why Tennessee's licensure requirement would fail that test, and the court sees none. Tennessee has a legitimate interest in addressing fraud and incompetence in the auctioneering field, and its relatively undemanding licensure scheme is rationally related to that interest. The decision to require a license for extended-time online auctions, but not timed online auctions, is rationally supported by extended-time auctions' greater similarity to conventional auctions and greater vulnerability to escalatory bidding strategies, including fraudulent ones. The

---

arises, however, when the regulation at issue "singles out specific subject matter for differential treatment"—such as when, for example, a regulation treats commercial speech about one subject matter differently from commercial speech about another. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020).

plaintiffs, therefore, have no plausible likelihood of success and no entitlement either to a preliminary injunction or to a denial of the plaintiffs' motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's Motion to Dismiss (Doc. No. 18) will be granted, and the plaintiffs' Motion for Preliminary Injunction (Doc. No. 8) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge